**Barry G. RATTIGAN, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

No. 96–4160.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1998.

Decided Aug. 4, 1998.

Richard A. Cline (argued), Mitchell, Allen, Catalano & Boda, Columbus, OH, Barry G. Rattigan, Ray Brook, NY, Brian D. Dunbar (briefed), Cleveland, OH, for Petitioner–Appellant.

Gary L. Spartis (argued and briefed), Office of the U.S. Attorney, Columbus, OH, for Respondent–Appellee.

Before: MARTIN, Chief Judge; NORRIS and CLAY, Circuit Judges.

BOYCE F. MARTIN, Jr., Chief Judge.

Barry G. Rattigan appeals the judgment of the district court to deny his motion under 28 U.S.C. § 2255 vacating his sentence for aiding and abetting in the use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2. The basis of Rattigan's collateral attack on his conviction is his contention that an instruction given to the jury during his trial on the term "use" was erroneous in light of *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). Because we find that there was sufficient evidence for a properly instructed jury to find that Rattigan aided and abetted the use of a firearm, we do not believe Rattigan was prejudiced by the erroneous jury instruction. Therefore, we AFFIRM the district court.

## FACTS

In May 1991, Special Agent Frank D'Alesio, from the Bureau of Alcohol, Tobacco, and Firearms (ATF), began investigating several individuals for drug trafficking in Columbus, Ohio. During the investigation, Agent D'Alesio learned from Richard Ferguson, a confidential informant and a convicted felon, that several individuals were trafficking crack cocaine from an apartment located at 376 South 18th Street in Columbus. Consequently, Agent D'Alesio arranged for two controlled purchases of cocaine from the 18th Street apartment. On June 17, D'Alesio and Ferguson went to the address in D'Alesio's undercover vehicle. While Agent D'Alesio waited outside, Ferguson used funds that had been pre-recorded by the ATF to purchase crack cocaine at the apartment. After Ferguson completed the illicit transaction, he returned to D'Alesio and gave him the crack he had just bought from Rattigan. He told D'Alesio that Rattigan and someone named Tony, who was armed with a handgun, had sold him the crack cocaine in the apartment. At trial, Ferguson testified that Tony opened the door with a gun in his hand. Tony then took his money, then tucked the gun under his arm and exchanged the money with Rattigan for crack cocaine.

Ferguson admitted to having purchased drugs from Rattigan and Tony a number of times in the past and at different locations around the city. During these transactions, Rattigan, Tony, or both would be present. Ferguson testified further that during several of these prior drug transactions only Tony was armed with a handgun and that he kept it on his side or in his hand. Ferguson never saw Rattigan with a handgun. Of the working relationship between Rattigan and Tony, Ferguson testified that Rattigan had to approve of the drug sales in order for a transaction to go forward.

On June 18th, Ferguson returned to the 18th Street apartment to make another controlled drug purchase, but this time he was accompanied by undercover ATF agent Larry Ford. The two approached the apartment and knocked on the door. As had been the procedure in past transactions, Tony opened the door, admitted the buyers, and shut the door. This time, however, neither Ferguson nor Ford saw Tony with a gun. Once inside the apartment, Ferguson and Ford saw Rattigan on the other side of the room by a card table, holding a ceramic plate containing pieces of crack cocaine. Rattigan told Ford to approach the table. When Ford paid Rattigan $25, Rattigan told Ford to select a piece of crack from the plate.

That night, ATF agents executed a search warrant at the apartment. According to the agents, when they entered the apartment, Rattigan and Tony ran from the east bedroom into the west bedroom. Rattigan was carrying a ceramic plate. Tony escaped through the window, while Rattigan shoved the plate through another window but was apprehended before he could escape. During a search incident to Rattigan's arrest, agents discovered money in his pockets, including marked bills from the two controlled drug buys. After searching the apartment, the agents found a .45 caliber semi-automatic pistol on the floor in the east bedroom, where the defendants had first been seen when the agents entered the apartment. The gun was loaded with eight rounds, including one round in the chamber. Also in the east bedroom, agents discovered a bundle of money on the bed. The bundle included marked bills from the two controlled purchases made by Ferguson and Ford. In the west bedroom, where Rattigan was arrested, agents discovered ammunition for various caliber weapons. Ferguson testified that the gun presented by the government at trial appeared to be the same type, color, and size as the one he had seen on Tony during previous drug transactions.

## PROCEDURE

On July 1, 1991, a federal grand jury for the Southern District of Ohio returned a four-count indictment against Rattigan. Counts One and Two charged Rattigan with knowingly and intentionally distributing cocaine base in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Three charged Rattigan with knowingly and intentionally possessing with the intent to distribute over five grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(B)(iii); and Count Four charged Rattigan with knowingly aiding and abetting the use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 on or about June 17 and 18, 1991.

A jury convicted Rattigan of all counts, and this Court affirmed his conviction and sentence. *United States v. Rattigan*, 996 F.2d 1218, 1993 WL 190910 (6th Cir. June 2, 1993) (unpublished disposition). In a motion to vacate his sentence under 28 U.S.C. § 2255, Rattigan challenged: (1) whether his § 924(c)(1) conviction is valid in light of *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); and (2) whether counsel rendered ineffective assistance. The district court denied his motion as without merit. Upon review, this Court granted Rattigan's application for a certificate of appealability with regard to whether the jury "necessarily based" its verdict to convict him on a constitutionally valid instruction as to the meaning of "use" under § 924(c)(1). At trial, Rattigan made no objection to the instruction.

## STANDARD OF REVIEW

In reviewing the denial of a 28 U.S.C. § 2255 petition, this Court applies a *de novo* standard of review of the legal issues and will uphold the factual findings of the district court unless they are clearly erroneous. *Gall v. United States*, 21 F.3d 107, 109 (6th Cir.1994). In a collateral attack, to obtain post-conviction relief for an erroneous jury instruction, to which no objection was made at trial, a defendant must show both cause excusing his procedural default and actual prejudice from the alleged error. *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Williams v. United States*, 98 F.3d 1052, 1054 (8th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1327, 137 L.Ed.2d 488 (1997).

## DISCUSSION

### *Erroneous Jury Instruction*

Rattigan was charged in Count Four of his indictment with aiding and abetting the "use" of a firearm in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2. The instructions to the jury stated in pertinent part:

> A firearm may be "used" by bearing the firearm on one's person or under one's immediate control or by keeping a firearm in one's possession and under one's control in a house. Possession may be actual or constructive ... However, it is not necessary to show that the firearm was discharged, pointed or displayed. Even a firearm kept hidden during a drug transaction may be used in relation to a drug transaction crime if it facilitated the crime by emboldening the defendant, giving him the security and confidence to undertake the drug offense, or if the firearm is kept ready to protect a drug house, thereby safeguarding and facilitating the drug transaction.

J.A. at II94–95.

This instruction permitted the jury to convict Rattigan under the "fortress theory" or "facilitation theory." These theories interpreted the "use" and "carry" language of § 924(c)(1) broadly and allowed for a conviction under this statute if it reasonably appeared that the firearm found on a premises controlled or owned by a defendant was in his actual or constructive possession and was to be used to protect the drugs or to otherwise facilitate the drug transaction. *United States v. Henry*, 878 F.2d 937, 944 (6th Cir. 1989). These theories have not been followed after *Bailey. See United States v. Anderson*, 89 F.3d 1306, 1315 (6th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 786, 136 L.Ed.2d 728 (1997); *United States v. Moore*, 76 F.3d 111, 114 (6th Cir.1996); *United States v. Bingham*, 81 F.3d 617, 623–24 (6th Cir.1996).

In *Bailey*, the Supreme Court adopted a much narrower interpretation of the term "use" under § 924(c)(1) and rejected the theory that the "use" prong of § 924(c)(1) could be satisfied upon a showing that the presence of the firearm "facilitated" the commission of the drug offense, or by the mere possession of a firearm by the offender. *Bailey*, 516 U.S. at 148–49, 116 S.Ct. 501. Instead, *Bailey* redefined "use" as "active employment," thereby requiring that the

firearm be "an operative factor in relation to the predicate offense." *Id.* at 143, 116 S.Ct. 501. The types of culpable behavior that amount to "use" include: brandishing, displaying, bartering, striking with, firing or attempting to fire a firearm. *Id.* at 148, 116 S.Ct. 1035. Under the new interpretation of "use," liability under § 924(c)(1) attaches for actual use, not intended use. *Id.* at 149–50, 116 S.Ct. 1035.

In *United States v. Taylor*, 102 F.3d 767, 770 (6th Cir.1996), *cert. denied,* — U.S. —, 118 S.Ct. 327, 139 L.Ed.2d 254 (1997), where the jurors were permitted to convict the defendant if they found that he "had possession of the weapon in the sense that he had both the power and intention, ... to exercise dominion and control over it ....", this Court found the instructions to the jury to be incorrect after *Bailey.* This Court found that the instructions allowed for a conviction based upon possession and declared them invalid. *Id.* In *Moore,* the jury was instructed that firearms are "used" in contravention of § 924(c)(1) if they are "found on the premises controlled or owned by defendant and in his actual or constructive possession [and are] to be used to protect the drugs or otherwise facilitate a drug transaction ... " 76 F.3d at 114. These instructions permitted the jury to convict the defendant for using a firearm if it was within his actual or constructive possession or if it facilitated the crime. Likewise, the instructions were found to be inadequate after *Bailey. Id.* at 113–14.

The language of the jury instructions in the present case is indistinguishable from that of *Taylor* or *Moore,* and equally repugnant of *Bailey.* In this case, as in *Taylor* and *Moore,* the jury was permitted to convict Rattigan for "use" upon a finding of behavior that was less than active employment, namely constructive possession or facilitation of the crime. As such, the instructions are invalid in light of *Bailey.*

1. Cases from the Sixth Circuit concerning the appeal of a § 924(c)(1) conviction due to erroneous jury instructions have been direct appeals rather than appeals of § 2255 denials and, therefore, this Circuit has applied plain error review. *See Taylor,* 102 F.3d at 769–70; *United States v.*

*Necessary Basis of the Jury Verdict*

Because Rattigan is attacking his conviction collaterally, a higher standard of review than mere plain error is applicable. Instead, Rattigan must show both "cause" excusing his procedural default and "actual prejudice" resulting from the error of which he complains. *Frady,* 456 U.S. at 168, 102 S.Ct. 1584; *Williams,* 98 F.3d at 1054.[1]

*(a) Cause for Procedural Default*

■ Sufficient cause excusing a defendant's procedural default has been found in similar situations to that of Rattigan's. For example, in *Williams,* a defendant who was convicted pre-*Bailey* for drug related crimes including the "use" of a firearm in violation of § 924(c)(1) appealed the denial of his § 2255 motion for post-conviction relief based on an erroneous jury instruction on "use." The instruction was proper at trial, yet determined to be improper after *Bailey. Williams,* 98 F.3d at 1054. Therefore, Williams did not object to the jury instruction. As a result, the jury instruction he raised on collateral attack was procedurally defaulted. *Id.* In *Anderson,* the defendant did not object to a jury instruction that permitted his conviction under the fortress theory. 89 F.3d at 1315. This Court found that his failure to object was "understandable" in light of this Circuit's approval of the facilitation and fortress theory at the time of the instruction. *Id.* This Court found that the erroneous jury instruction seriously affected his judicial proceedings. *Id.*

Likewise, the erroneous instruction by the district court in Rattigan's case was proper at trial but has subsequently become defective as a result of *Bailey.* The cause for Rattigan's failure to object to the jury instructions at trial, and his failure to raise the issue upon his direct appeal, was his assumption at the time, that the instruction to the jury on the definition of "use" was adequate. This is borne out by the fact that in support

*Anderson,* 89 F.3d at 1315; *but see Frady,* 456 U.S. at 164–65, 102 S.Ct. 1584 (plain error standard is out of step when prisoner launches a collateral attack because a final judgment commands respect).

of the court's "use" instruction, the government cited authority that has subsequently been criticized for its interpretation of § 924(c).[2] As such, the jury instruction issue Rattigan raises is procedurally defaulted and cause exists for its review. *See Williams,* 98 F.3d at 1054.

### (b) Actual Prejudice

 In order to obtain collateral relief for errors in a jury charge, a prisoner must show not merely that the instruction was erroneous, but that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Frady,* 456 U.S. at 169, 102 S.Ct. 1584 (quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (Stevens, J. dissenting)). The error in the instruction should be evaluated within the total context of the overall jury charge, the process of instruction, and the several components of the trial, including the testimony of witnesses, argument of counsel, receipt of exhibits, and instructions by the judge. *Frady,* 456 U.S. at 169, 102 S.Ct. 1584 (citing *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). In this Circuit if "actual prejudice" exists, the Court must vacate the defendant's conviction unless it finds that the jury would necessarily have convicted him under a post-*Bailey* jury instruction. *Ferrell v. United States,* 963 F.Supp. 615, 619 (E.D.Mich.1997) (citing *Moore,* 76 F.3d at 112).

The government cites to *United States v. Mauldin,* 109 F.3d 1159 (6th Cir.1997), and *Taylor,* for the proposition that if a properly instructed jury would have concluded that a defendant could have been convicted under the "carry" prong of § 924(c)(1), he was not prejudiced by an erroneous jury instruction. The government also cites to *Bright v. United States,* 107 F.3d 870 (6th Cir.1997) (unpublished disposition), for the proposition that where the evidence satisfies both prongs of § 924(c)(1), then any error in pre-*Bailey* jury instructions on the definition of "use" is harmless.

This argument can be dispatched without a discussion of whether there is sufficient evidence to support a conviction under the "carry" prong of § 924(c)(1). In *Mauldin, Taylor* and *Bright,* the defendant was charged with both "use" and "carry" under § 924(c)(1) and the jury was instructed as to both prongs of the statute. In the present case, Count Four of Rattigan's indictment stated only that he had knowingly "used" a firearm in violation of § 924(c). It did not charge him with "carrying" a firearm, and the jury was also instructed only on "use." Indeed, discussion between counsel and the district court reveals that "carry" was altogether stricken from the instruction under the belief that "use" and "carry" were synonymous.[3]

 A defendant's conviction under the "use" prong of § 924(c)(1) cannot be upheld under the "carry" prong when the defendant was not indicted under the "carry" prong and when the court did not instruct the jury on the term "carry." *Ferrell,* 963 F.Supp. at 622 (citing *United States v. Golden,* 102 F.3d 936 (7th Cir.1996) and *United States v. Wacker,* 72 F.3d 1453 (10th Cir.1995)). In *Wacker,* the Tenth Circuit reversed the convictions of four defendants who had been

---

2. At trial the government noted that, although Rattigan did not object to the jury instructions, sufficient case law existed to support the court's instruction on "use." J.A. at II–11. The government cited to *United States v. Acosta–Cazares,* 878 F.2d 945, 951–52 (6th Cir.1989), and *United States v. Henry,* 878 F.2d 937, 944 (6th Cir.1989), for the proposition that "use" should be interpreted broadly and that it covers situations where a gun is readily accessible to a drug dealer and facilitates the transaction. J.A. at II–13. These cases apply the "fortress theory," which has been has not been followed post-*Bailey. See Bingham,* 81 F.3d at 623–24. (criticizing *Henry*).

3. At trial, a colloquy was had between the government and the court in relation to the jury instructions on the language of § 924(c)(1).

MR. SPARTIS(counsel for respondent): My feeling is that use or carry are interchangeable in that particular code section. However, we did not specifically charge carry in the indictment. So for the sake of just preventing any possible problems, we agreed to delete the language carried from the instructions. Mr. Fleck and I have talked about that and we are in agreement.

THE COURT: Those will be removed by agreement then.

J.A. at II–11.

charged under the "use" prong of 924(c)(1) before the *Bailey* decision. Applying *Bailey,* the Tenth Circuit did not find any evidence of defendant Wacker's "active employment" use of a firearm. Rather than remand the case for a determination whether Wacker "carried" the firearm, the court reversed his conviction because he had not been charged under the "carry" prong of § 924(c)(1). *Wacker,* 72 F.3d at 1464, n. 8. Similarly, in *Golden,* because the defendant was not charged with "carrying" a firearm, the Seventh Circuit was left with no choice but to reverse his conviction once it found insufficient evidence to support his conviction for "using" a firearm. 102 F.3d at 948.

Thus, the focus of our inquiry is limited to whether a jury necessarily would have found that Rattigan aided and abetted Tony's "use" of a gun as that term has been interpreted under *Bailey.*

### Tony's "Use" of a Firearm

To decide if Rattigan violated § 924(c)(1) and § 2 requires a determination that Tony, as a principal, "used" the firearm. The "use" prong of § 924(c)(1) requires sufficient evidence of "active employment," and not mere possession. *Bailey,* 516 U.S. at 143, 116 S.Ct. 501; *Anderson,* 89 F.3d at 1314. "Active employment" must be of the type that makes the firearm an operative factor in the drug offense. *Bailey,* 516 U.S. at 143, 116 S.Ct. 501.

The post-*Bailey* cases in this Circuit in which the element of "use" has not been satisfied have been those in which this Court could not distinguish whether the firearm had an active role during the drug transaction, or whether it was merely being stored near a drug transaction. *United States v. Milledge,* 109 F.3d 312, 315 (6th Cir.1997) (no "use" where guns found in rooms of house and defendant was not holding or brandishing them); *United States v. Myers,* 102 F.3d 227, 236 (6th Cir.1996) (no "use" where guns were under passenger seat of a car). Tony's "use" of the firearm was active because, on at least one occasion, Ferguson witnessed Tony tuck his gun under his arm after accepting the marked drug money. This particular act is beyond mere possession; and the gun was "used" in a manner culpable after *Bailey.* The fact that Tony handled the gun in such an active fashion shows he went beyond the mere storage of a weapon. In addition, Ferguson also testified to occasions when he had seen Tony at the 18th Street door of the apartment with a handgun tucked under his right arm. On these occasions, Tony can be said to have "displayed" or "brandished" the gun during a transaction as a "silent but obvious and forceful presence." *See Bailey,* 516 U.S. at 148–49, 116 S.Ct. at 508. Ferguson did not testify to the ease with which he saw the gun, though he stated that almost every time Tony opened the door, the gun was visible. Based on the foregoing, Tony was "using" the gun in violation of § 924(c)(1).

### Rattigan's "use" of a Firearm

Rattigan argues that he cannot be convicted of "using" a firearm in violation of § 924(c)(1) because no evidence was introduced to indicate that he actually possessed the gun. However, 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Accomplice liability under this statute holds one criminally responsible for acts that he or she assists or influences another in performing. *Nye & Nissen v. United States,* 336 U.S. 613, 620, 69 S.Ct. 766, 93 L.Ed. 919 (1949). This Court has previously upheld convictions under § 924(c)(1) under a theory of aiding and abetting even in cases in which the defendant never had actual possession of a firearm during the course of committing the crime. *See United States v. Jones,* 102 F.3d 804 (6th Cir.1996); *United States v. Lowery,* 60 F.3d 1199 (6th Cir.1995).

Aiding and abetting has been described "as one's desire to 'in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to

make it succeed.'" *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir.1992) (en banc), *cert. denied*, 508 U.S. 975, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J.)). The government must prove that the defendant, as the accomplice, associated and participated in the use of the firearm in connection with the underlying drug crime. *Morrow*, 977 F.2d at 231 (citing *Nye*, 336 U.S. at 619, 69 S.Ct. 766). The government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him. *United States v. Winston*, 687 F.2d 832, 835 (6th Cir.1982). This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime. *United States v. DePace*, 120 F.3d 233, 238–39 (11th Cir.1997) (unarmed defendants' act of furtherance and intent to aid in commission of the crime was their presence at the scene of the drug crime and the division of labor between them and principals which facilitated the scheme whereby their principals brandished firearms), *cert. denied*, —— U.S. ——, 118 S.Ct. 1177, 140 L.Ed.2d 185 (1998).

In *Morrow*, defendant Morrow and his principal, Mooneyham, were arrested in a marijuana field while cultivating marijuana plants. Both were adorned in camouflage and ski masks, allegedly worn for protection from other drug dealers, and the principal wore a holstered revolver around his waist. Morrow's conviction for aiding and abetting the principal's carrying of a firearm was upheld. This Circuit found that the defendant's act of wearing the ski mask and the certainty that the defendant must have observed the weapon could lead a reasonable juror to conclude from the principal's possession that the defendant likewise intended that the gun be used for protection.[4] *Id.* We emphasized the fact that Morrow benefitted from the firearm as much as his principal and that the gun facilitated Morrow's illegal drug trafficking efforts as much as it did for his principal. *Id.* at 231.

 In the present case, the district court found that Rattigan aided and abetted Tony's use of a gun based upon the frequency of the drug sales and thereby surmised that it was "highly unlikely that Tony's armed presence during the drug transactions was merely coincidental." R. at 30. Indeed, had Rattigan not been dealing drugs, we do not believe that Tony would have use for his gun under these circumstances. Therefore Rattigan can be said to have been more than a mere knowing spectator. We also agree that it may be reasonably inferred from the repetitive nature of the drug sales that Rattigan knew of Tony's gun and benefitted from its presence for protection in much the same way as had the defendant in *Morrow*. Ferguson testified that the entry procedure into the apartment always began with Tony answering the door with his weapon either at his side or in his hand and that Rattigan was positioned at a nearby table with a plate of crack cocaine facing him. Although there was evidence that Ferguson once bought crack cocaine from Tony without the presence of Rattigan, most of the times Ferguson purchased drugs there he followed an established procedure by which Rattigan and Ferguson would operate. Rattigan gave final approval for the drug sale to proceed and doled out the crack, while Tony watched the door as the lookout and protector of the drugs.

Rattigan can be said to have aided and abetted the "use" of a firearm in violation of § 924(c)(1) and a jury, properly instructed as to the post-*Bailey* meaning of the term "use," would have found the same.

For the foregoing reasons, the district court's decision is AFFIRMED.

---

4. Morrow and Mooneyham had changed in each other's presence from street clothes into their camouflaged outfits and the arresting United States Forest Service Officers testified the gun was visible from twenty-five feet. *Morrow*, 977 F.2d at 231.