*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0059p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 03-6207/6255

WILLIAM L. HARRIS (03-6207); TARVIS HOLMES (03-6255),

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 02-20262—Jon Phipps McCalla, District Judge.

Argued: September 21, 2004

Decided and Filed: February 8, 2005

Before: KEITH, MOORE, and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Robert C. Brooks, Memphis, Tennessee, Eric Scott Hall, WAGERMAN LAW FIRM, Memphis, Tennessee, for Appellants. Lorraine Craig, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** Robert C. Brooks, Memphis, Tennessee, Eric Scott Hall, WAGERMAN LAW FIRM, Memphis, Tennessee, for Appellants. Lorraine Craig, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. This case requires us to determine whether the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005), extends to judicial fact-determinations under 18 U.S.C. § 924(c)(1)(B)(i) ("§ 924 Firearm-Type Provision") and its accompanying U.S. Sentencing Guidelines ("Guidelines") provision, § 2K4.2(b). U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 2K2.4. Section 924(c)(1) is the federal statute providing for mandatory additional sentences for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1). Guideline § 2K2.4 provides that, except in the case where an individual qualifies as a career offender under U.S.S.G. § 4B1.1, "the guideline sentence [for a § 924(c) violation] is the minimum term of imprisonment required by

1

statute." U.S.S.G. § 2K2.4(b). We hold that the § 924 Firearm-Type Provision mandatory minimum is not binding on a sentencing court unless the type of firearm involved is charged in the indictment and proved to a jury beyond a reasonable doubt.

This case arises out of a July 2, 2002 drug bust in Memphis, Tennessee. Following a jury trial, Defendant-Appellant William L. Harris ("Harris") was convicted under the federal attempt statute regarding drug offenses, 21 U.S.C. § 846; the federal aiding and abetting statute, 18 U.S.C. § 2; and the main statute at issue in this appeal, 18 U.S.C. § 924(c). Defendant-Appellant Tarvis Holmes ("Holmes") was convicted under the same three statutes, as well as the federal conspiracy statute regarding drug offenses, 21 U.S.C. § 846. Specifically, Holmes and Harris were both convicted of aiding and abetting in attempted possession with the intent to distribute approximately one kilogram of a mixture containing a detectable amount of cocaine, and of aiding and abetting in possession of a firearm while attempting to commit a drug-trafficking crime. Holmes was also convicted of conspiring to possess with intent to distribute approximately one kilogram of a mixture containing cocaine.

On appeal, both defendants challenge the sufficiency of the evidence (Holmes on conspiracy, Harris on possession of a firearm while committing a drug-trafficking offense, and both defendants on attempted possession of cocaine). Both also challenge the district court's application of the enhanced § 924 Firearm-Type Provision penalty. However, they do so in different ways: Holmes challenges the application of that provision in the absence of a jury finding as to the type of firearm involved; Harris challenges the district court's use of the aiding and abetting statute to apply the enhanced penalty to an individual who is not alleged to have personally possessed the semiautomatic weapon in question.[1] Harris also challenges the trial court's decision not to apply the U.S.S.G. § 3B1.2 minor-role adjustment. We **AFFIRM** the pertinent convictions for attempted possession of cocaine with the intent to distribute, conspiracy to possess cocaine with the intent to distribute, and possession of a firearm in furtherance of a drug-trafficking offense; **VACATE** the district court's application of the enhanced § 924 Firearm-Type Provision penalty; and **REMAND** the case to the district court for further proceedings consistent with this opinion and with the Supreme Court's decision in *Booker*.

## I. BACKGROUND

There are two separate "cocaine" transactions relevant to this appeal. The second, on July 2, 2002, ended in a drug bust leading to the arrest and indictment of the four individuals charged in the district court. The first took place approximately one and a half to two weeks before the July 2, 2002 transaction, and involved a package full of cake mix rather than cocaine.

Testimony indicated that the first transaction took place as follows. Confidential Informant Frederick Milan ("Milan") (apparently not acting as an informant at that time) approached Melvin Douglas ("Douglas") to find out whether Douglas knew anyone who would be interested in purchasing cocaine. Douglas indicated that he did know someone. Thinking of Jamie Wilson ("Wilson") as the potential buyer, Douglas approached his own cousin, Holmes, with the information about a possible cocaine purchase, because he knew Holmes would be able to convey the information to Wilson. According to Douglas, Holmes contacted Wilson and then told Douglas that Wilson was interested in making a purchase. After some negotiation about the quantity of cocaine to be involved, the deal was arranged.

---

[1]Harris also submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j) calling the court's attention to the Supreme Court's decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and suggesting that this case would be relevant to Harris's challenge to the § 924(c) sentence.

Wilson gave Douglas money to purchase the cocaine. Without Wilson or Holmes present, Douglas purchased a package of what he believed to be cocaine from Milan. Douglas then met Wilson and Holmes to deliver the package. The transaction seemed at first to have been successful, but when Wilson opened the package, he discovered that it contained cake mix rather than cocaine. Understandably upset, Wilson, Holmes, and Douglas tried to locate Milan but were unable to do so.

At Wilson's instruction, Douglas made repeated attempts to contact Milan. After an unspecified period of time, Douglas succeeded in contacting Milan, and Milan expressed disbelief that the package had in fact contained cake mix. Milan offered to arrange a make-up deal in which Wilson would get cocaine at what would apparently be a bargain price. Wilson hesitated at first, but eventually agreed to the make-up deal. For this second deal, Douglas and Wilson were supposed to meet Milan at the same location (a particular Texaco station) where the first deal had taken place. Unbeknownst to Douglas and Wilson, however, Milan had informed the Shelby County Sheriff's Office of the planned transaction and had obtained the cocaine he planned to sell Wilson from the Sheriff's Office.

Douglas arrived at the Texaco station in a burgundy truck, Wilson in a Saturn, and Harris and Holmes in a white Neon. Before notifying Milan that they had arrived, however, Douglas, Harris, Holmes, and Wilson left the Texaco and drove to a nearby Wal-Mart parking lot. Douglas got in the Saturn with Wilson, and both the Saturn and the Neon returned to the Texaco station. At the Texaco station, Wilson gave Douglas the purchase money and a nine-millimeter pistol. Wilson then left Douglas in the Saturn and joined with Harris and Holmes in the Neon. Douglas then notified Milan that he was at the Texaco station.

Milan arrived at the Texaco station in a gold Maxima driven by an undercover detective, Reginald Hubbard. The Maxima and the Saturn then drove to a nearby Schlotzsky's parking lot to complete the transaction. The Neon parked nearby at a Holiday Inn Express. Milan left the Maxima and got into the front passenger's seat of the Saturn. After confirming that Douglas did have a package of money, Milan returned to the Maxima to get the cocaine. When Milan left the Saturn, Douglas placed a call to Wilson to let him know that everything was "straight." Joint Appendix ("J.A.") at 66 (Selby Test.), 155 (Douglas Test.). Milan gave the take-down signal and carried the cocaine in a cooler from the Maxima to the Saturn. Once Douglas had taken the cocaine out of the cooler — but before he had a chance to cut the package open — the take-down proceedings began.

At this point, Douglas was taken out of his vehicle and placed under arrest. Officers attempted to stop the Neon, but the vehicle refused to stop until it reached a dead end in the parking lot. Once the Neon reached the dead end, Wilson exited from the driver's seat, taking a weapon with him (later found to be an Intratech nine-millimeter). At some point, however, Wilson dropped the weapon. Holmes exited the vehicle from the front passenger seat, and Harris exited from the back seat. Wilson, Holmes, and Harris all began to flee, but were soon apprehended on or near the property of the nearby Colonial Golf Course.

A black .357-revolver was found in the parking lot near where Holmes exited the Neon. During later interrogation, Holmes apparently admitted that he threw the revolver down as he was exiting the vehicle. Other weapons and ammunition were found in the back seat of the vehicle (where Harris was sitting) and in the trunk.

Douglas and Wilson pleaded guilty to the charges of conspiracy to possess cocaine and violation of § 924(c). After jury trial, Harris was convicted of aiding and abetting in attempted possession of cocaine and aiding and abetting in a violation of § 924(c), but acquitted on the conspiracy charge. Holmes was convicted of conspiracy, aiding and abetting in attempted possession of cocaine, and aiding and abetting in a violation of § 924(c). At sentencing, the government contended that the Intratech nine-millimeter dropped by Wilson qualified as a

semiautomatic assault weapon under the § 924 Firearm-Type Provision, but that an SKS rifle recovered from the Neon's trunk did not. Although neither Harris nor Holmes presented evidence challenging the government's characterization of the Intratech nine-millimeter, both asserted at sentencing that they could not be held accountable for such a weapon because it had not been charged in the indictment or proved to the jury beyond a reasonable doubt. The district court determined that it was required to hold Harris and Holmes responsible for the semiautomatic weapon, despite its absence from the indictment and the jury charge.[2] Harris and Holmes appealed.

## II.  JURISDICTION AND STANDARD OF REVIEW

The district court properly had jurisdiction under 18 U.S.C. § 3231 because Harris and Holmes were charged with violations of federal criminal law. We have jurisdiction pursuant to 28 U.S.C. § 1291 because Harris and Holmes timely appealed a final judgment of the district court.

A district court's application of § 924(c) is a question of law subject to de novo review. *United States v. Langan*, 263 F.3d 613, 626-27 (6th Cir. 2001). When reviewing claims for insufficient evidence, we will sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Gibbs,* 182 F.3d 408, 419 (6th Cir.), *cert. denied*, 528 U.S. 1051 (1999); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Whether a defendant is entitled to a downward offense-level adjustment under U.S.S.G. § 3B1.2 "depends heavily on factual determinations, which we review only for clear error." *United States v. Solorio*, 337 F.3d 580, 601 (6th Cir.), *cert. denied*, 540 U.S. 1063 (2003). As the Guidelines are now effectively advisory, we review the final sentence ultimately imposed by a district court in light of *Booker* only for reasonableness. *Booker*, 125 S. Ct. at 765-66 (Breyer, J.).

## III.  ANALYSIS

### A.  The Impact of *Booker* on the § 924(c) Sentence

In *Booker*, the Supreme Court concluded that the Sixth Amendment prevents federal judges from making factual determinations that increase a defendant's sentence on the basis of facts not reflected in the jury's verdict. *Id*. at 745-47, 756 (Stevens, J.) ("Accordingly, we reaffirm our holding in *Apprendi*: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.").[3] The

---

[2]Harris was sentenced to sixty-three months of imprisonment on the attempted possession charge and one hundred twenty months of imprisonment on the § 924(c) charge, the two terms to run consecutively for a total term of imprisonment of one hundred eighty-three months. Holmes was sentenced to two sixty-three-month terms of imprisonment for conspiracy to possess cocaine and attempted possession of cocaine, these two terms to run concurrently, and a one-hundred-twenty-month term of imprisonment on the § 924(c) charge, to run consecutive to the two concurrent sixty-three-month terms. This sentence gave Holmes the same total term of imprisonment as Harris, one hundred eighty-three months.

[3]*United States v. Booker*, 125 S. Ct. 738 (2005), is the latest in a line of recent Supreme Court cases expanding the reach of the Sixth Amendment Jury Trial Clause. *See generally Jones v. United States*, 526 U.S. 227, 251-52 (1999) ("construing [the federal carjacking statute, 18 U.S.C.] § 2119 as establishing three separate offenses by the specification of distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict"); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Ring v. Arizona*, 536 U.S. 584, 589 (2002) (holding that "[c]apital defendants, no less than noncapital defendants . . .are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment"); *Blakely*, 124 S. Ct. at 2537 ("Our precedents make clear, however, that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts*

Court went on to conclude that this constitutional holding required the invalidation of 18 U.S.C. §§ 3553(b)(1) and 3742(e). *Id.* at 756-57 (Breyer, J.). As § 3553(b)(1) is the provision which makes the Guidelines mandatory, the *Booker* decision "makes the Guidelines effectively advisory." *Id.* at 757 (Breyer, J.).

Neither *Booker* nor its immediate predecessor, *Blakely v. Washington*, 124 S. Ct. 2531 (2004), addressed the constitutionality of judicial fact-determinations for purposes of mandatory minimum sentences under the § 924 Firearm-Type Provision. This subsection presents particular problems,[4] because *Booker* teaches that there is no Sixth Amendment violation when a sentencing judge exercises genuine discretion within a clearly defined statutory range. *See Booker*, 125 S. Ct. at 750 (Stevens, J.) ("We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. . . . For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."). Although not entirely clear, the Supreme Court has implied that § 924(c) sets forth a statutory maximum sentence of life in prison, regardless of whether the sentencing judge finds any of the factors enhancing the required minimum. *See*

---

*reflected in the jury verdict or admitted by the defendant.*"); *see also Castillo v. United States*, 530 U.S. 120, 131 (2000) (holding that "Congress intended the firearm type-related words it used in [a prior version of] § 924(c)(1) to refer to an element of a separate, aggravated crime"). *But see Almendarez-Torres v. United States*, 523 U.S. 224, 226-27 (1998) (holding that 8 U.S.C. § 1326(b)(2) "is a penalty provision, which simply authorizes a court to increase the sentence for a recidivist," and "does not define a separate crime"); *Harris v. United States*, 536 U.S. 545, 568 (2002) (holding "that the federal provision at issue, 18 U.S.C. § 924(c)(1)(A)(ii), is constitutional," because "[b]asing a 2-year increase in the defendant's minimum sentence on a judicial finding of brandishing does not evade the requirements of the Fifth and Sixth Amendments").

[4] The relevant portion of the subsection reads as follows:

(c)(1)(A)  Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime —
    (i)  be sentenced to a term of imprisonment of not less than 5 years;
    (ii)   if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
    (iii)   if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.
(B)   If the firearm possessed by a person convicted of a violation of this subsection —
    (i)  is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or
    (ii)   is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.
(C)   In the case of a second or subsequent conviction under this subsection, the person shall —
    (i)  be sentenced to a term of imprisonment of not less than 25 years; and
    (ii)   if the firearm involved is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life.
(D)   Notwithstanding any other provision of law —
    (i)  a court shall not place on probation any person convicted of a violation of this subsection; and
    (ii)   no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.

18 U.S.C. § 924(c)(1).

*Harris v. United States*, 536 U.S. 545, 554 (2002) ("Since the subsections alter only the minimum, the judge may impose a sentence well in excess of seven years, whether or not the defendant brandished the firearm."); *id*. at 574 (Thomas, J., dissenting) (referring to "the statutory maximum of life imprisonment for any violation of § 924(c)(1)(A)"). However, unlike most Guidelines provisions, which provide for overlapping sentencing ranges, *see Booker*, 125 S. Ct. at 775 (Stevens, J., dissenting), the Guidelines provision relating to § 924(c) does not provide for sentencing ranges. Instead, U.S.S.G. § 2K2.4 provides that, except when an individual qualifies as a career offender under U.S.S.G. § 4B1.1, "the guideline sentence [for a § 924(c) violation] is the minimum term of imprisonment required by statute." U.S.S.G. § 2K2.4(b). The Commentary to the Guidelines emphasizes this position, explicitly stating that where an individual who is not a career offender is sentenced for a § 924(c) violation, "a sentence above the minimum term required by [that statute] is an upward departure from the guideline sentence." *Id*. cmt. 2(B).

This presents us with a troubling situation. The Guidelines range for a § 924(c) violation is the minimum statutory range. *Booker* clearly applies to judicial fact-determinations under the (formerly mandatory) Guidelines, but the *Booker* Court did not address whether it applies to fact determinations under (still mandatory) statutory provisions such as § 924(c). The central problem is how to reconcile, for *Booker* purposes, the Guidelines mandate (now recommendation) of the minimum possible sentence in a particular factual situation with the apparent possibility of a (rarely, if ever, imposed, *see Harris*, 536 U.S. at 578 & n.4 (Thomas, J., dissenting)) maximum sentence of life imprisonment for any violation of § 924(c). If we look only at the theoretical possibility of a life sentence for any § 924(c) violation, the reasoning of *Booker* suggests that there is no Sixth Amendment violation. However, under the Guidelines regime, a life sentence was only possible — absent an upward departure — for a person who, having previously been convicted for a violation of § 924(c), is again convicted of violating the subsection, the second time with a very serious weapon. *See* 18 U.S.C. § 924(c)(1)(C)(ii) (mandating life sentence only in the case of a "second or subsequent conviction under this subsection" where "the firearm involved is a machinegun or destructive device, or is equipped with a firearm silencer or firearm muffler"). Given the severe constraints on imposition of a life sentence in the pre-*Booker* world, it would seem strikingly at odds with the principles set forth in *Booker* to hold that the sudden advisory nature of the Guidelines prevents the (still mandatory) provisions of § 924(c) from violating the Sixth Amendment.

We begin our analysis of *Booker*'s effect on § 924(c) with a recognition that 18 U.S.C. § 924 has been addressed in two of the Supreme Court's recent decisions on the scope of the Sixth Amendment Jury Trial Clause. *See Castillo v. United States*, 530 U.S. 120 (2000); *Harris*, 536 U.S. at 545. In *Castillo*, Justice Breyer, writing for a near-unanimous Court, held that under the version of § 924(c)(1) effective prior to November 13, 1998, "Congress intended the firearm type-related words it used in § 924(c)(1) to refer to an element of a separate, aggravated crime." *Castillo*, 530 U.S. at 131. In *Harris*, Justice Kennedy, writing for a five-justice majority, held that the version of § 924(c)(1)(A)(ii) (the "§ 924 Brandishing Provision") effective after November 13, 1998 was constitutional, because "[b]asing a 2-year increase in the defendant's minimum sentence on a judicial finding of brandishing [a firearm] does not evade the requirements of the Fifth and Sixth Amendments." *Harris*, 536 U.S. at 568. Neither of these decisions, nor any of the Court's more recent decisions, directly addressed the constitutionality of the § 924 Firearm-Type Provision against a Sixth Amendment challenge. As the defendants properly raised their Sixth Amendment claims, both in the court below and on appeal, we must now address an issue of first impression: whether, after *Booker*, the enhancement contained in the § 924 Firearm-Type Provision can constitutionally be imposed on the basis of judicial fact-finding. We conclude that it cannot.

In making this determination, we note that the Supreme Court has provided substantial guidance in its prior cases. Although the *Castillo* decision rested in part on the structure of § 924(c) as it existed prior to November 13, 1998, *see Castillo*, 530 U.S. at 124-25, the Court also devoted significant attention to why the type of firearm involved in a § 924(c) violation is more appropriately

considered an element of the offense rather than a sentencing factor. First, the *Castillo* Court emphasized that "[t]raditional sentencing factors often involve either characteristics of the offender, such as recidivism, or special features of the manner in which a basic crime was carried out (*e.g.*, that the defendant abused a position of trust or brandished a gun)." *Id*. at 126. By contrast, the Court "c[ould] not say that courts have typically or traditionally used firearm types (such as 'shotgun' or 'machinegun') as sentencing factors, at least not in respect to an underlying 'use or carry' crime." *Id*. (citing *Jones v. United States*, 526 U.S. 227, 234 (1999)); *see also id*. at 127 ("[W]e do not have any indication that legislatures or judges typically have viewed the difference between using a pistol and using a machinegun as insubstantial."). Second, the Court noted that treating firearm type as an element would not create the sort of logistical problems that might be raised by treating more traditional sentencing factors as elements. *Id*. ("[T]o ask a jury, rather than a judge, to decide whether a defendant used or carried a machinegun would rarely complicate a trial or risk unfairness."). Third, the Court noted that "the length and severity of an added mandatory sentence that turns on the presence or absence of a 'machinegun' (or any of the other listed firearm types) weighs in favor of treating such offense-related words as referring to an element." *Id*. at 131.

In *Harris*, the Court then confirmed that the structure of the version of § 924(c)(1)(A) effective after November 13, 1998 was the kind which allowed the Court to "presume that its principal paragraph defines a single crime and its subsections identify sentencing factors." *Harris*, 536 U.S. at 553. As the § 924 Firearm-Type Provision — the provision currently before us — immediately follows § 924(c)(1)(A) and uses (indeed, is part of) the same structure, *Harris* requires us to presume that the § 924 Firearm-Type Provision is an additional sentencing factor, like § 924(c)(1)(A)(ii)-(iii) (the "§ 924 Brandishing/Discharge Provisions"), relating to the single crime defined in § 924(c)(1)(A)(i). *Harris*, 536 U.S. at 553. However, this observation does *not* mandate a finding that the § 924 Firearm-Type Provision sets forth only sentencing factors. As the *Harris* majority also noted, "even if a statute 'has a look to it suggesting that the numbered subsections are only sentencing provisions,' the text might provide compelling evidence to the contrary." *Id*. (quoting *Jones*, 526 U.S. at 232). Critically, the *Harris* majority's discussion of why the text of the § 924 Brandishing/Discharge Provisions does not provide such evidence to the contrary relies primarily on the nature of "brandishing" as a traditional sentencing factor and on the "incremental changes in the minimum — from 5 years, to 7, to 10" for simply possessing, then brandishing, then discharging a weapon. *See id*. at 553-54. This analysis cannot reasonably be applied, in light of *Castillo*, to a traditional element — type of firearm involved — associated with sharply higher minimum sentences (from 5 years, to 10 years, to 30 years) by § 924(c)(1)(B).

Moreover, the doctrine of constitutional avoidance counsels us to treat the § 924 Firearm-Type provision as setting forth elements rather than sentencing factors. *See generally Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Were we to construe the § 924 Firearm-Type Provision as setting forth sentencing factors to be decided by a judge, rather than elements of a crime to be decided by a jury, we would face a serious constitutional problem because of its potential conflict with *Booker*'s Sixth Amendment holding. *See Booker*, 125 S. Ct. at 745-47, 756 (Stevens, J.). We conclude that the tradition of treating firearm type as an element, *see Castillo*, 536 U.S. at 126-27, the sharply higher penalties involved, *see id*. at 131, and the serious constitutional problems that would result from a contrary conclusion, *see DeBartolo*, 485 U.S. at 575, are together sufficient to overcome the presumption, based on the structure of the statute, that § 924(c)(1)(B) is intended to set out sentencing factors rather than elements of separate crimes.

Having determined that the firearm types set out in the § 924 Firearm-Type Provision are elements of separate crimes, rather than sentencing factors, we must conclude that *Booker* does require that § 924 Firearm-Type Provision enhancements be charged in the indictment and proved

to a jury beyond a reasonable doubt.  We emphasize that our holding on this issue is narrow.  We do not address the general constitutionality of mandatory-minimum sentences imposed through judicial fact-finding, a practice explicitly approved by the Supreme Court prior to *Booker* when traditional sentencing factors, rather than elements, are involved.  *See Harris*, 536 U.S. at 568; *see also United States v. Koch*, 383 F.3d 436, 438-39 (6th Cir. 2004) (en banc), *overruled on other grounds by Booker*, 125 S. Ct. 738.  Instead, we hold only that in light of Supreme Court precedent distinguishing those aspects of crimes traditionally considered elements from those traditionally considered sentencing factors, the § 924 Firearm-Type Provision mandatory minimum is not binding on a sentencing court unless the type of firearm involved is either admitted by the defendant or charged in the indictment and proved to a jury beyond a reasonable doubt.[5]

## B.  Remaining Claims

As an initial matter, Harris's challenge to the application of § 924(c) through the aiding and abetting statute is without merit.  It is well established in this circuit that an individual "can be convicted of using or carrying a firearm [under an earlier version of § 924(c)], even though he never personally used or carried any weapon during the period charged in the indictment."  *Wright v. United States*, 182 F.3d 458, 464 (6th Cir. 1999); *Rattigan v. United States*, 151 F.3d 551, 557 (6th Cir.), *cert. denied*, 525 U.S. 1031 (1998); *United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995); *see also United States v. Davis*, 306 F.3d 398, 412 (6th Cir. 2002), *cert. denied*, 537 U.S. 1208 (2003).  However, both defendants' challenges to the sufficiency of the evidence and Harris's challenge to the district court's failure to apply a role adjustment deserve further discussion.

### 1.  Sufficiency of the Evidence

#### a.  Conspiracy

Holmes argues that the government has failed to put forward sufficient evidence to permit a rational trier of fact to convict him of conspiracy to possess cocaine.  *See Gibbs*, 182 F.3d at 419-20.  In order to sustain a conspiracy conviction, the government must show that a rational trier of fact could have found that Holmes (1) was aware of the object of the conspiracy; and (2) voluntarily associated himself with its purpose.  *Id*. at 421.  Once such a conspiracy is shown, however, "evidence connecting a particular defendant to the conspiracy 'need only be slight.'"  *Id*. (quoting *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)).

In this case, uncontradicted testimony indicated that Douglas asked Holmes to approach Wilson about possibly purchasing the first package of cocaine (i.e., the one that turned out to be cake mix), and that Holmes in fact did so.  J.A. at 136 ( Douglas Test.).  This demonstrates both that Holmes was aware of the object of the conspiracy and that he voluntarily associated himself with its object and purpose.[6]  Holmes's presence in the car (and actual possession of a .357-revolver) during the July 2, 2002 transaction provides additional evidence of his voluntary association with, and continued membership in, the conspiracy to possess cocaine.

---

[5]We emphasize that, in light of *Harris*, this holding does not apply to the mandatory-minimum sentences relating to firearm brandishing and discharge in § 924(c)(1)(A)(ii)-(iii) (the "§ 924 Brandishing/Discharge Provisions"), which continue to bind sentencing judges.

[6]The indictment specifically notes that the conspiracy began "at a time unknown to the Grand Jury, but from at least on or about July 2, 2002."  J.A. at 26 (Indictment).  Accordingly, it is not problematic that this evidence of Holmes's knowledge of, and voluntarily association with, the object and purpose of the conspiracy dates to a transaction prior to the one which led to Holmes's arrest.

Because Holmes's role in the cake-mix transaction is sufficient to demonstrate his membership in the conspiracy — which continued in existence at the time of the July 2, 2002 transaction, Holmes's argument based on *United States v. Pearce*, 912 F.2d 159 (6th Cir. 1990), *cert. denied*, 498 U.S. 1093 (1991), is not helpful to him. It does not matter whether "mere presence in the car with Wilson and Harris," Holmes Br. at 20, would be sufficient to sustain the conspiracy conviction. Not only is it difficult to argue that Holmes was no more than "present" in the car, but also the government has introduced other evidence sufficient to tie Holmes to the conspiracy in question. Under these circumstances, a rational trier of fact could conclude that Holmes both (1) was aware of the object of the conspiracy and (2) voluntarily associated himself with its purpose.

### b. Attempted Possession

Both Harris and Holmes were convicted of attempted possession of cocaine through the aiding and abetting statute, 18 U.S.C. § 2. "[T]he essential elements of aiding and abetting are (1) an act by the defendant that contributes to the commission of the crime, and (2) an intention to aid in the commission of the crime." *Davis*, 306 F.3d at 412. Accordingly, the Court must determine whether any rational finder of fact could determine that these elements have been satisfied. *See Gibbs*, 182 F.3d at 419-20.

Holmes argues that he "did nothing more than sit in the passenger seat of Wilson's car while Douglas attempted to purchase the cocaine from the informant." Holmes Br. at 23. However, the government presented uncontradicted evidence strongly suggesting that Holmes was present to provide additional firepower in case Milan or his associates attempted to cheat Wilson in the July 2, 2002 deal. The jury heard testimony suggesting that, in the front seat of the car alone, there was an Intratech nine-millimeter, J.A. at 68, 71 (Selby Test.), and a .357-revolver (J.A. at 72). As the district judge noted at sentencing, "[F]rankly, the impression that we all had as a result of listening to all the proof was this was sort of like an armed party going to get the drugs with some pretty heavy — pretty heavy ornaments." J.A. at 434 (August 12, 2003 Sentencing Hr'g). Additionally, Holmes's involvement in the cake-mix transaction provided further evidence of his intent to contribute to the commission of the crime. Under these circumstances, a rational trier of fact could conclude both that (1) Holmes's presence in the car contributed to the attempted possession of cocaine and (2) Holmes intended to contribute to the commission of this crime.[7]

The government also presented uncontradicted evidence strongly suggesting that Harris, like Holmes, was present to provide additional firepower in case Milan or his associates attempted to cheat Wilson in the July 2, 2002 deal. In the back seat of the car, where Harris admits that he was sitting, Harris Br. at 8, the jury heard testimony suggesting that there was a .380-caliber pistol, a magazine loaded with ammunition for that pistol, and a nine-clip magazine for the SKS rifle that was found in the trunk of the car. J.A. at 72 (Selby Test.). Under these circumstances, a rational trier of fact could conclude that Harris's presence in the car contributed to the attempted possession of cocaine.

A rational trier of fact could also conclude that Harris intended to contribute to the attempted possession of cocaine. Absent any indication to the contrary, his presence in such a heavily armed car, where he could hear the relevant phone conversations and watch the exchange of drugs and money, was sufficient to allow a reasonable trier of fact to conclude that his continued presence in the car indicated that he intended to aid and abet in the attempted possession of cocaine.

---

[7]Harris cites a long string of cases in support of his argument that the government failed to prove that he had either actual or constructive possession of the cocaine in question. Harris Br. at 14-18. It is not necessary to reach the merits of this argument, because Harris was not convicted of actual or constructive possession of the cocaine, but of aiding and abetting in attempted possession of the cocaine.

### c. Section 924(c)

Harris and Holmes were both convicted of § 924(c) violations through the aiding and abetting statute. In order to establish aiding and abetting liability under § 924(c),

> [t]he government must show that the defendant was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him. *This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime.*

*Wright*, 182 F.3d at 465 (quoting *Rattigan*, 151 F.3d at 558) (alteration in *Wright*) (emphasis added). In the present case, a rational jury could conclude that the government has met this burden. The jury heard testimony that Harris was in a car loaded with weapons and ammunition. J.A. at 68-72 (Selby Test.). The weapon that Wilson possessed was not so small as to avoid notice, and the strap attached to it made it even more noticeable. A rational jury could conclude that Harris both knew that Wilson was armed and acted with the intent to assist in the attempted possession of cocaine.

### 2. Role Adjustment

Harris argues that the district court erred in failing to grant him a four-level downward adjustment as a minimal participant in the drug transaction under U.S.S.G. § 3B1.2(a). Alternatively, he argues that the district court erred in failing to grant him a two-level minor-role adjustment under U.S.S.G. § 3B1.2(b).[8] In this case, it does not appear that the district court ever ruled on Harris's U.S.S.G. § 3B1.2 objection. *See* J.A. at 423-439 (August 12, 2003 Sentencing Hr'g), 440-483 (August 29, 2003 Sentencing Hr'g). Although the U.S. Sentencing Guidelines are now only advisory, district courts are still required to "consult those Guidelines and take them into account when sentencing." *Booker*, 125 S. Ct. at 767 (Breyer, J.). *See also* FED. R. CRIM. P. 32(i)(3)(B).

Accordingly, we remand the case to the district court for a ruling on Harris's § 3B1.2 objection and for compliance with the requirements of *Booker*.

## IV. CONCLUSION

We **AFFIRM** the pertinent convictions for attempted possession of cocaine with the intent to distribute, conspiracy to possess cocaine with the intent to distribute, and possession of a firearm in furtherance of a drug-trafficking offense; **VACATE** the district court's application of the enhanced 18 U.S.C. § 924(c)(1)(B)(i) penalty; and **REMAND** the case to the district court for further proceedings consistent with this opinion and with the Supreme Court's decision in *Booker*.

---

[8]In the district court, both Harris, J.A. at 553 (Harris's objections to the Presentence Report ("PSR")), and Holmes, J.A. at 546 (second addendum to Holmes's PSR) objected to the PSR's failure to recommend a U.S.S.G. § 3B1.2 downward adjustment. However, Holmes does not contest this issue on appeal. *See* Holmes Br. (neither setting forth this argument nor adopting Harris's arguments on this issue).