**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0044n.06
Filed: January 18, 2006

**No. 03-3737**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

                                         ON APPEAL FROM THE UNITED

v.                                    STATES DISTRICT COURT FOR THE
                                         NORTHERN DISTRICT OF OHIO

JUAN VALDEZ-REYES,

        Defendant-Appellant.

_____/

**Before:**     **CLAY and GIBBONS, Circuit Judges; STEEH, District Judge.**[*]

      **GEORGE C. STEEH, District Judge.** A jury convicted defendant, Juan Valdez-Reyes, of conspiracy to possess with intent to distribute over five-hundred grams of cocaine and over fifty grams of cocaine base or "crack" in violation of 21 U.S.C. § 846, possession with intent to distribute over five-hundred grams of cocaine in violation of 21 U.S.C. § 841(a)(1), and possession with intent to distribute over fifty grams of cocaine-base in violation of 21 U.S.C. § 841(a)(1). On appeal, defendant challenges the sufficiency of evidence to support his convictions, the district court's admission of opinion evidence that defendant was acting as a "lookout," and the district court's failure to give an aiding and abetting instruction to the jury. For the reasons set forth below, we **AFFIRM** defendant's convictions.

**I.**

_____

     [*] The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

## BACKGROUND

Defendant Juan Valdez-Reyes, Luis Valdez, Giovanni Medina, and Gino Francisco Almonte were arrested at the Talleyho Tel in Youngstown, Ohio, as part of a controlled drug buy arranged by a Youngstown Drug Enforcement Task Force with the cooperation of self-professed drug-dealer Marlan Everson. Poland Village Police Officer Daniel DeVille testified that the Task Force received information in April 2002 that Everson was receiving large quantities of powder cocaine, "crack" cocaine, and heroin from New York City. In May 2002, controlled drug purchases were made from two Youngstown, Ohio homes owned by Everson, leading to the execution of search warrants on June 3, 2002. Everson was arrested at one of his homes after large quantities of drugs were found inside. Facing the possibility of a significant prison sentence for a third drug conviction, Everson agreed to cooperate with the Task Force in apprehending his New York City drug sources.

Everson initially arranged a controlled drug buy with two men from New York City named Jesus Morel and Marino Diaz. Morel and Diaz were later arrested at an Everson home. Everson identified a second pair of men from whom he purchased drugs, "Cano," later identified as defendant's brother Luis, and "Giovanny," later identified as Medina. Everson told the Task Force that Luis and Medina had been making weekly to bi-weekly deliveries of multi-kilogram quantities of cocaine using a silver-colored van and a small dark foreign car, with both vehicles having New York State license plates. Everson placed four phone calls to Medina and arranged for a drug transaction to take place at the Hotel on June 4, 2000, at 8:00 p.m..

Valdez-Reyes admits that he drove Luis and Medina 400 miles from New York to Youngstown in his silver Dodge Caravan. According to him, the purpose of the trip was to assist his passengers in purchasing property and to spend time with his brother. The day before the trip,

2

Valdez-Reyes had his van professionally cleaned, inside and out, at a cost of $60.00. Once in Youngstown, the three men met Almonte, who paid for their adjoining rooms at the Hotel.

According to Officer DeVille, a Task Force team of 10-12 officers arrived at the Hotel at 7:00 p.m.. Officers observed a dark-colored Nissan Sentra parked in front of adjacent Rooms 103 and 105 and a silver Dodge Caravan parked at the end of the parking lot, away from the rooms. The rooms were in the back of the Hotel and opened directly into the parking lot. Both the Nissan and Dodge vehicles bore New York license plates. After learning that both rooms were registered in Almonte's name, the team continued surveillance, watching four men move freely between the rooms as the doors remained open. As instructed, Everson, who was in his jail cell, called Medina's cell phone and changed the meeting place for the drug buy from the Hotel to one of Everson's homes. After the phone call was completed, Luis and Medina were observed entering the Dodge van, while Almonte was viewed entering the Nissan. Officer DeVille testified that defendant "was seen at the doorway looking out."

City of Salem Police Sergeant John Panezott testified that he saw the van being stopped by fellow Task Force members as it attempted to exit the parking lot. Panezott then ran to the back of the Hotel, where he heard Officer DeVille yell that someone was inside the parked Nissan. Sergeant Panezott testified that defendant was standing 10-20 feet away from the Nissan: "I saw [defendant] standing outside the motel looking around the parking lot. Almost simultaneously [defendant] saw Agent DeVille heading towards the car and got a look of shock on his face and I ordered him at one point down." When asked what defendant was specifically doing, Sergeant Panezott answered: "Acting as a look-out." The district court admitted this testimony over defendant's objection, reasoning that Panezott was permitted to express his opinion. Later in the trial, Task Force member

3

and Beaver Township Corporal Burl Patton testified that he saw defendant standing in the doorway "look[ing] around a little bit and his attention was focused on Almonte." Patton opined that defendant "was looking back and forth and kind of like a look-out would." Defendant's objection to this opinion testimony was also overruled.

Almonte was removed from the Nissan and arrested. One kilogram of cocaine was found on the passenger seat, and three kilograms of cocaine were discovered inside a secret compartment in the glove box. Later forensic testing revealed the presence of both powder cocaine and cocaine base or "crack." The drugs had an estimated street value of $100,000.00. Luis and Medina were arrested from within defendant's van. FBI Special Agent Kelly Nusser employed a K-9 unit outside the van, and with the doors closed, the dog alerted to the presence of a narcotics odor. During a warrant-based search of the van the following day, no drugs, weapons, or secret compartments were discovered. Officer Deville described the van as "spotless" and the van carpeting as "still wet" from its recent shampooing. Officer Nusser testified that the van smelled strongly of deodorizer and that people transporting drugs often use odors of this kind to hide the smell of narcotics. No drugs, weapons, or significant amounts of cash were found in the rooms, or on any of the four suspects. An address book taken from defendant's person listed three phone numbers for "Molly Mull," an alias used by Everson.

Everson testified at defendant's trial as part of a plea agreement he reached with respect to his own June 3, 2002 arrest and anticipated third drug conviction. Everson admitted that, in exchange for his cooperation and testimony, he would not face multiple cocaine possession charges and a felony firearm charge, but would instead plead guilty to a single cocaine possession charge and receive a sentence reduction from a mandatory 240 months to a range of 70 to 87 months.

4

Everson testified that he had been buying drugs from New York City sources since October or November 2001 and that drug transactions were prearranged to take place in Youngstown at either his home or a hotel. Drugs were transported in "a black El Camino or a blue Honda civic and a gray Astro van," with some vehicles equipped with secret compartments. Everson remained in weekly contact with Morel, Luis, and/or Medina, receiving one to five kilograms of cocaine a week at a price of $22,000.00 to $23,000.00 per kilogram.

Everson further testified that Morel became ill in February 2002, prompting Luis and Medina to begin supplying him with drugs using a mini-van and a Nissan. Everson identified a third person who accompanied Luis and Medina from New York City, an individual Everson knew by the name of "Shay-Shay." Everson identified defendant as "Shay-Shay." Everson testified that defendant previously came to his home with Luis and Medina when Everson paid for drug deliveries. Everson said that they would count the money together in front of each other, and that Luis and Medina would then wrap up the counted money and hand it to defendant. Everson testified that he saw defendant in the Youngstown area "about four times" between February and May 2002. Everson stated defendant, as "Shay-Shay," previously drove a gray Astro van to Youngstown, accompanied by Luis, Medina, and Medina's girlfriend.

Everson admitted on cross-examination that he never phoned defendant or received a phone call from defendant. Everson also admitted that he first told authorities just five days before defendant's trial that defendant had been to Youngstown prior to June 4, 2002 . Everson explained that he did not mention this fact earlier because he was never asked the question. Everson also testified that he told the interviewing officer when shown defendant's photograph in the early

5

morning hours of June 5, 2002 that "I don't know actually his real name and I told them I don't know him as [Valdez-Reyes]. I know him as Shay-Shay, Cano's brother."

In rebuttal, defendant testified to the jury that he had never been to Youngstown prior to June 4, 2002, and denied knowing Everson or having the nick-name "Shay-Shay." Defendant clarified that he had been watching television in his room on June 4, 2002 when he heard noises outside, and "so I got up and opened the door and when I opened the door they made me go to the ground." Defendant denied transporting drugs to Youngstown.

At the close of the government's proofs, defendant moved under Federal Rule of Criminal Procedure 29(a) for a judgment of acquittal based on insufficiency of evidence as to all charges. The district court denied the motion on finding that fact issues remained to be decided by the jury. Defendant renewed the Rule 29 motion at the close of all evidence, and the motion was again denied. Following the two-day trial, the jury returned November 27, 2002 guilty verdicts on all three drug conspiracy and possession charges. Two days earlier, co-defendants Luis and Almonte had pleaded guilty to a single drug conspiracy charge with respect to cocaine powder only. Defendant was sentenced on May 14, 2003 to 121 months incarceration and five years of supervised release. Defendant filed a timely notice of appeal on May 21, 2003.

## II.
## DISCUSSION

### A. Admission of Opinions that Defendant Acted as a "Lookout"

Defendant argues the district court erred by overruling his objections and admitting Panezott's and Patton's opinions that defendant was acting as a "lookout" at the Hotel. A district court's evidentiary rulings will not be reversed absent a clear showing of an abuse of discretion. *United States v. Williams*, 952 F.2d 1504, 1518 (6th Cir. 1991). An abuse of discretion exists if the

6

reviewing court is left with a firm conviction that a mistake has been made. *Id.* An abuse of discretion in the admission of evidence constitutes harmless error if it does not affect the defendant's substantial rights. Fed. R. Crim. P. 52(a).

Like any witness, a government agent may testify in the form of a lay opinion if the opinion meets the requirements of Federal Rule of Evidence 701. *United States v. Graham*, 856 F.2d 756, 759 (6th Cir. 1988). Lay opinion testimony is admissible under Rule 701 if it is rationally based on the perception of the witness, helpful to a clear understanding of the witness' testimony or a determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. One panel of this Circuit has reasoned that "[i]n applying Rule 701, the modern trend among courts 'favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination.'" *United States v. Booth*, No. 90-5748, 1991 WL 119530, \*\*4 (6th Cir. July 3, 1991) (unpublished) (quoting *Teen-Ed, Inc. v. Kimball Intern, Inc.*, 620 F.2d 399, 403 (3rd. Cir. 1980), and citing J. Weinstein, Evid. para. 701[02], at 701-09, 701-17 (1978)).

Panezott's and Patton's opinions that defendant was acting as a lookout at the Hotel were based on their personal perceptions of defendant's conduct as viewed just prior to the arrests of defendant, Luis, Medina, and Almonte. Panezott testified that he saw defendant "standing outside the motel looking around the parking lot," "[r]ight outside the door at 105," and that defendant "got a look of shock on his face" when he saw Officer DeVille running toward the Nissan parked nearby. Patton testified that he observed defendant "standing at the doorway," "look[ing] around a bit and his attention was focused on Almonte." The district court could legitimately conclude in exercising its discretion that the opinion testimony would clarify for the jury that the officers believed

7

defendant was more than a disinterested observer of the parking lot, and that defendant was not "ordered down" when he first appeared in the doorway. Panezott and Patton were subjected to rigorous cross-examination, with Panezott testifying that, unlike a lookout protecting a large quantity of drugs, defendant was unarmed, was not wearing shoes, did nothing to stop any of the officers, did not give an audible signal, and looked surprised by the officers' presence. Patton testified on cross-examination that he could not see defendant when Luis and Medina first walked out into the parking lot, and that defendant first appeared in the doorway as Almonte left the room.

To support his argument of an abuse of discretion in the admission of the opinion testimony, defendant relies on an unpublished decision of this Circuit, *United States v. Burgess*, 983 F.2d 1069, 1992 WL 393575 (6th Cir. Dec. 12, 1992) (table), finding that a district court erred in permitting a law enforcement officer to restate the Government's theory of the case in the form of an opinion.

> We agree with White that the trial court erred in allowing Winings to restate the government's theory of the case in the form of his opinion. A police officer clearly should not be permitted to state his opinion that a defendant was a coconspirator with other defendants on trial. There is no significant difference in allowing the police officer to state his opinion that a defendant's role in the charged conspiracy was to serve as a lookout and guard the money for his alleged coconspirators. The jury was certainly capable of making a determination of Burgess' participation or non-participation in the charged conspiracy based on admissible evidence presented to it, and Officer Winings' opinion was neither necessary nor helpful to the jury in arriving at this determination. . . . .

*Id*. at **4. In *Burgess*, the officer's opinion that defendant Burgess acted as a guard and lookout was found to have unduly influenced the jury's guilty verdict on a drug conspiracy charge in the absence of substantial evidence that Burgess otherwise participated with his co-defendants White and Muncy in attempting to purchase marijuana from an undercover officer. *Id*. at **7. Aside from the opinion evidence, the record established only that Burgess traveled as a passenger to the scene of the drug transaction with his co-defendants and remained in the car, whereas White and Muncy left the

8

vehicle upon arrival, walked to the undercover officer's parked car, negotiated a purchase price, and showed the officer $10,000.00. *Id.* at **1, **7. The opinion evidence that Burgess acted as a lookout and guard was the only evidence proffered against Burgess in support of the conspiracy charge, an opinion that was inconsistent with the remaining undisputed evidence that Burgess' name was never mentioned to the undercover officer during the price negotiations, Burgess did not drive the car to the pre-arranged location, and no connection was made between Burgess and the drug money or a firearm hidden in the car. *Id.* at **7. "At the scene of the negotiations, the witnesses concurred that [Burgess] did absolutely nothing other than sit in the car while White and Muncy worked out the final details of the sale." *Id.*

*Burgess* is distinguishable. Officers Panezott and Patton articulated personal observations of defendant beyond his mere presence at the Hotel to support their opinions that defendant was acting as a lookout on June 4, 2002. Panezott testified that defendant was standing just outside of Room 105, looking around the parking lot, 10-20 feet away from the Nissan, as Almonte left a room and walked to the Nissan, at a time just after Everson called Medina's cell phone and changed the location of the pre-arranged drug transaction from the Hotel to Everson's home. Patton likewise testified that he saw defendant first appear in the doorway looking back and forth, focusing on Almonte, as Almonte left a room and walked toward the Nissan. Further, and unlike *Burgess*, it is undisputed that defendant drove Luis and Medina 400 miles to the scene of the pre-arranged drug sale to Everson. This and other evidence, as discussed below, eliminates any reasonable probability that defendant's convictions resulted solely from the opinion testimony that defendant was acting as a lookout and defendant's mere presence at the Hotel. *See Burgess*, 1992 WL 393575, at **8; *Booth*, 1991 WL 119530, at **4.

9

Defendant's reliance on *United States v. Jones*, 605 F.Supp. 513 (S.D.N.Y. 1984), is equally misplaced. As in *Burgess*, the only evidence offered to support the drug conspiracy conviction in *Jones* was the defendant's presence at the scene of a street drug-buy and an officer's opinion that street drug-dealers often use lookouts. *Id*. at 516-517. The *Jones* court found there was insufficient evidence to support the conviction, distinguishing between a jury properly weighing an opinion in a case supported by adequate evidence, and the government improperly using an officer's opinion to salvage a factually insufficient case. *Id*. at 516 (quoting *United States v. Young*, 745 F.2d 733, 767 (2d. Cir. 1984)). Here, factual evidence well beyond opinion testimony and defendant's presence at the Hotel was submitted to the jury to support the government's case.

The admission of Officers Panezott's and Patton's opinions that defendant was acting as a lookout was neither the result of manifest error nor a clear abuse of discretion. *Williams*, 952 F.2d at 1518; *Booth*, 1991 WL 119530 at **4. At best, any error in the admission of the opinion testimony was harmless in light of other evidence submitted to the jury. Fed. R. Crim. P. 52(a).

**B. Sufficiency of Evidence**

A district court's denial of a motion for acquittal is reviewed *de novo*. *United States v. Chambers*, 195 F.3d 274, 276 (6th Cir. 1999). A claim of insufficient evidence to sustain a jury conviction is reviewed by this court to determine whether, in "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. DeJohn*, 368 F.3d 533, 543 (6th Cir.) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)), *cert. denied*, 125 S.Ct. 510 (2004). "All credibility determinations are drawn in favor of the prosecution." *Id.* "[C]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every

reasonable hypothesis except that of guilt.'"  *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir.1984)).

**i. Drug Conspiracy**

The essential elements of a criminal drug conspiracy are "an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act." *United States v. Crayton*, 357 F.3d 560, 573 (6th Cir.) (quoting *United States v. Sullivan*, 903 F.2d 1093, 1098 (7th Cir. 1990)), *cert. denied*, 124 S.Ct. 2857 (2004).  The government must prove that the defendant was both aware of the object of the conspiracy, and voluntarily associated himself with its purpose.  *United States v. Harris*, 397 F.3d 404, 414 (6th Cir. 2005) (citing *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999)).

Defendant does not dispute that the government proved the existence of a criminal conspiracy to possess and distribute cocaine in Youngstown, Ohio on June 4, 2002.  *See* Defendant's Final Brief, May 23, 2005, at 22 (conceding that "the government presented plenty of evidence that a conspiracy existed between Everson, Morel, Giovanny [Medina] and Luis [Valdez]. . . ").  Indeed, evidence of Everson's phone calls to Medina in New York City asking for a cocaine delivery to Youngstown, Ohio on June 4, 2002, and Medina's arrival on June 4, 2002 at a Youngstown Hotel where Almonte, who paid for Medina's room, was arrested inside a vehicle bearing New York State license plates and containing four kilograms of cocaine, would permit any rational jury to find that the essential elements of a criminal drug conspiracy were proven beyond a reasonable doubt: an agreement between Everson, Medina and Almonte to intentionally violate the Controlled Substances Act.  *DeJohn*, 368 F.3d at 543; *Crayton*, 357 F.3d at 573.

11

Once the existence of a criminal conspiracy is proven, as here, "evidence connecting a particular defendant to the conspiracy 'need only be slight.'" *Harris*, 397 F.3d at 414 (quoting *Gibbs*, 182 F.3d at 421 (6th Cir. 1999)). Viewed in a light most favorable to the prosecution, the evidence presented by the government sufficiently connected defendant to the proven drug conspiracy to possess and distribute cocaine in Youngstown, Ohio on June 4, 2002. Defendant admitted driving Luis and Medina 400 miles from New York City to Youngstown, Ohio using his own van. That van had recently been cleaned and deodorized, a practice consistent with common practice by drug traffickers. An address book taken from defendant's person contained Everson's phone numbers under Everson's nick-name "Molly Mull." Everson's testimony, deemed credible for purposes of this appeal, permits any reasonable juror to conclude beyond a reasonable doubt that: (1) defendant, as "Shay-Shay," accompanied Luis and Medina from New York City to Youngstown on four previous occasions between February and May 2002; (2) Everson paid cash for kilogram and multi-kilogram cocaine deliveries made during those four visits; (3) the four men, including defendant, counted Everson's drug payments in front of each other; (4) the payments ranged from $22,000.00 to over $100,000.00 cash, depending on the amount of drugs Everson purchased; and (5) the counted cash was wrapped up and handed over to defendant. This evidence of defendant's active participation with Everson, Luis, and Medina in four prior 2002 cocaine conspiracies and sales transactions could properly be relied upon by the jury in determining defendant's motive, intent, and knowledge as to the undisputed June 4, 2002 drug conspiracy also involving Everson, Luis, and Medina. *See* Fed. R. Evid. 404(b). Defendant's arguments challenging Everson's credibility on appeal are misplaced.[1]

---

[1] In addition to stressing the circumstances underlying Everson's plea agreement, defendant attempts to challenge Everson's credibility by demonstrating that the silver-colored Dodge Caravan defendant drove to the Hotel on June 4, 2002 was purchased on April 17, 2002, yet Everson testified

*DeJohn*, 368 F.3d at 543. The jury was not required to believe defendant's testimony that he had never been to Youngstown prior to June 4, 2002, that he knew nothing of an impending cocaine sale, that he was not known as "Shay-Shay," and that he had never met, and did not know, Everson.

Evidence that an FBI canine unit alerted to an odor of narcotics emanating from defendant's van on June 5, 2002 provided additional circumstantial evidence of defendant's knowledge of, and voluntary association with, the established criminal conspiracy. Construed in a light most favorable to the government, any rational jury could reasonably infer that cocaine had been inside defendant's van prior to its arrival at the "Talleyho Tel" on June 4, 2002, despite defendant's testimony that the van had been professionally cleaned a day earlier in New York, and the uncontradicted evidence that no drugs were discovered inside the van following defendant's arrest. Officers Panezott's and Patton's opinions that defendant was acting as a lookout on June 4, 2002 provide still further support for any rational juror to conclude that defendant was aware of the drug conspiracy and voluntarily associated himself with its purpose. *See Harris*, 397 F.3d at 414.

*United States v. Wright*, 12 F.3d 215, 1993 WL 465164 (6th Cir. Nov. 10, 1993) (table) (per curiam), relied upon by defendant, is distinguishable on its facts. In *Wright*, defendant D'Annunzio's conspiracy conviction was reversed due to insufficient evidence that he had participated in a proven drug distribution conspiracy by guarding marijuana stored at the home of his co-defendant Wright, whose conspiracy and drug possession convictions were upheld. *Id*. at **1, **5. D'Annunzio's admission that he "housesat" Wright's home during the 1988 Thanksgiving weekend, where marijuana had been stored in the basement, and evidence that D'Annunzio made

_____

defendant drove a "gray Astro van" from February through May 2002. Everson did not testify that the Dodge van driven by defendant on June 4, 2002 was the same van Everson saw defendant driving in February through May 2002.

13

up to six trips with Wright to John DeBono's home when Wright delivered marijuana to DeBono, was found insufficient to prove D'Annunzio's connection to the marijuana distribution conspiracy because the record did not contain evidence to support a finding that D'Annunzio knew marijuana was stored in Wright's basement, or that D'Annunzio did anything more than socialize with Wright and DeBono. *Id*. at **3-**5. As explained,

> DeBono testified [as a government witness] that he and Wright always went into another room to execute the deal because DeBono did not know D'Annunzio well enough to trust him. After the transactions were completed, DeBono claimed that he, Wright, and D'Annunzio would smoke marijuana socially. Despite the cooperation of this key witness, the government presented *no* evidence that D'Annunzio ever saw any money or marijuana (other than the small amount he smoked socially) or that the conspiracy or any drug deals were ever discussed in D'Annunzio's presence.

*Id*. at **4 (emphasis in original).

In contrast, government witness Everson testified that defendant joined Everson, Luis, and Medina in counting tens of thousands of dollars in drug proceeds on at least four occasions prior to June 4, 2002, then took possession of the money after it had been counted. Any rational jury could conclude that Everson trusted defendant enough to count and receive significant cash payments in exchange for deliveries of cocaine to Everson from New York. The record evidence established more than a social association among defendant, Everson, Luis, and Medina. *See Wright*, 1993 WL 465164, at **4 (quoting *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990) for the proposition that "mere association with conspirators is not enough to establish participation in a conspiracy"). In fact, any rational jury could conclude beyond a reasonable doubt that defendant intentionally joined and participated in the charged cocaine conspiracy, and was not merely socializing with Luis, Medina, and Almonte at the Youngstown, Ohio Hotel on June 4, 2002. *Compare Pearce*, 912 F.2d at 162 (finding that evidence of defendant's mere presence at a "crack-

14

house" when SWAT team arrived shouting "It's a bust" was insufficient to support drug conspiracy conviction).

Viewing the record evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant was connected to the charged June 4, 2002 cocaine conspiracy, was aware of its object, and voluntarily associated himself with its purpose. *See DeJohn*, 368 F.3d at 543; *Harris*, 397 F.3d at 414. There was sufficient evidence in the record to convict defendant of conspiracy to possess with intent to distribute over five-hundred grams of cocaine powder and over fifteen grams of cocaine base.

**ii. Possession With Intent to Distribute**

The superceding indictment charged defendant with possession of cocaine powder and cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and aiding and abetting the possession and distribution of cocaine powder and cocaine base in violation of 18 U.S.C. § 2. The district court did not give an aiding and abetting instruction to the jury, but instead instructed the jury on the elements of actual, constructive, and joint possession, consistent with the constructive possession theory pursued by the government at trial.[2] In addition to challenging the sufficiency of evidence to convict under a constructive possession theory, defendant argues the district court's failure to read an aiding and abetting instruction, in the absence of an objection, constituted plain error affecting defendant's substantial rights. *See* Federal Rule of Criminal Procedure 52(a); *United*

---

[2] The government also did not pursue a theory of possession with intent to distribute under the doctrine articulated in *Pinkerton v. United States*, 328 U.S. 640, 646-647 (1946), which provides that, once it is determined that a rational jury could convict a criminal defendant of a criminal conspiracy, the defendant may be convicted for the substantive offenses committed by his co-conspirators during and in furtherance of that conspiracy. *See also United States v. Martin*, 920 F.2d 345, 348-349 (6th Cir. 1990).

15

*States v. Bryant*, 461 F.2d 912, 921 (6th Cir. 1972) (holding that failure to instruct on an aiding and abetting theory could substantially prejudice a defendant's case where the jury is not informed that specific criminal intent is an element of the offense).

Conviction for possession of illegal drugs with intent to distribute requires proof that: (1) the defendant knowingly; (2) possessed a controlled substance; (3) with intent to distribute.[3] *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995). Actual possession exists if the defendant is in immediate possession or control of the object, where constructive possession exists if the defendant "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Arnold*, --- F.3d ----, No. 04-5384, 2005 WL 3315297, at *4 (6th Cir. Nov. 23, 2005) (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)) (per curiam). "To establish constructive possession, the evidence must indicate 'ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed.'" *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991) (quoting *United States v. Gordon*, 700 F.2d 215, 217 (5th Cir. 1983)). Physical proximity to drugs alone is insufficient to support a finding of constructive possession. *Id*.

Consistent with the evidence supporting defendant's conspiracy conviction, any rational jury could find that defendant knew that Luis and Medina were leaving the Hotel at the same time as Almonte for the group's common purpose of making a large cocaine delivery to Everson, and not to check on a late pizza delivery. Any reasonable jury could also conclude that Almonte exercised

---

[3] Defendant does not challenge the "intent to distribute" element of the offense. Intent to distribute may be inferred from a large amount of drugs. *United States v. Phibbs*, 999 F.2d 1053, 1065-66 (6th Cir. 1993) (finding possession of one kilogram of cocaine sufficient to support rational inference of intent to distribute). The record evidence establishes that approximately four kilograms of cocaine were found inside the Nissan parked at the Hotel.

16

actual control over the Nissan containing four kilograms of cocaine, constituting actual possession

of the cocaine. *White*, 932 F.2d at 589. The dispositive issue thus becomes whether any reasonable

jury could conclude from the evidence, viewed in a light most favorable to the government, that

defendant had the power and intent to exercise control over the Nissan in which the cocaine was

concealed, either directly or through Almonte. *Arnold*, 2005 WL 3315297 at *4.

Officer Deville's testimony placed the Nissan containing drugs directly in front of the rooms

shared by the group, while defendant's van was parked at the end of the lot away from the rooms.

The shared rooms' doors remained open. Officers Panezott's and Patton's testimony placed

defendant 10 to 20 feet away from the Nissan, standing just outside the open doorway, looking

around and focusing on Almonte as Almonte walked toward the Nissan. Coupled with defendant's

established knowledge that Almonte, Luis, and Medina were leaving to make a large cocaine

delivery to Everson, any rational trier of fact could conclude from the entirety of the evidence that

defendant intentionally stood in the doorway as the others left, intending to exercise power and

control over the Nissan and drugs inside, both through Almonte, or in defendant's own right should

the situation arise. Defendant's intent can be found, in part, from Everson's testimony that defendant

repeatedly counted and took control of the drug proceeds in prior transactions. Control of the

proceeds certainly connotes control of the drugs, and such testimony is proof of defendant's intent

on June 4, 2002, the date of this transaction. No drugs were found inside the two Rooms, inside

defendant's recently-cleaned van, or on anyone's person. The Nissan was, however, parked directly

in front of the rooms while defendant's van remained away from the rooms. A rational fact-finder

could conclude from this evidence that defendant knew the object of the group's criminal conspiracy

was to sell cocaine to Everson, and therefor necessarily knew that the cocaine was inside the Nissan,

17

knew that Almonte was taking actual physical control over the Nissan and the drugs inside, and retained both the power and intent from his  vantage point in the open room doorway to take control over the Nissan and the cocaine within, either directly, or through Almonte, Luis, or Medina as they began to leave the parking lot.  *Arnold*, 2005 WL 3315297 at *4; *White*, 932 F.2d at 589.

The evidence goes beyond merely placing defendant at the Hotel.  *Compare United States v. Jenkins*, 90 F.3d 814, 816, 818 (3rd Cir. 1996) (finding evidence that defendant was in acquaintance's apartment sitting next to a coffee table where 55.3 grams of cocaine were in view was insufficient to support constructive possession conviction for lack of proof of dominion and control over the drugs in that defendant made no attempt to hide or destroy evidence, no drugs were found on his clothing, and his fingerprints were not found on the drugs); *White*, 932 F.2d at 589-590 (finding evidence that defendant lived three feet away from a known eighty-plant marijuana patch insufficient to support constructive possession conviction for lack of intent to possess where marijuana was not on defendant's property); *United States v. Littrell*, 574 F.2d 828, 832-833 (5th Cir. 1978) (finding evidence that defendant drove and parked car containing cocaine to delivery site phoned in by drug dealer, with defendant briefly talking to dealer before going into a bar, insufficient to support drug conspiracy conviction for lack of knowing participation due to absence of evidence that defendant owned car, had talked to drug dealer on the phone, knew cocaine was in the car, or knew that a drug deal was "going down").  Unlike this record, evidence of direct involvement in an ongoing criminal conspiracy was not proffered in *Jenkins*, *White*, or *Littrell*. Viewing this record in a light most favorable to the government, any rational jury could conclude that defendant was not simply standing at a hotel doorway 400 miles away from home with fellow drug conspirators, in close proximity to a vehicle containing four kilograms of cocaine, as a

18

consequence of being in the wrong place at the wrong time. The government was not required to eliminate every reasonable (or unreasonable hypothesis) except defendant's constructive possession of the Nissan and drugs inside. *Ellzey*, 874 F.2d at 328.

The dissenting opinion criticizes distinguishing *Jenkins*, *White*, and *Littrell* on the basis that they did not involve evidence of an ongoing criminal conspiracy. However, this additional evidence is the very evidence that could otherwise be relied upon by a rational jury to support a finding of constructive possession. *See United States v. Welch*, 97 F.3d 142, 150-51 (6th Cir. 1996) (distinguishing *White* as involving proofs limited to the defendant's "mere presence" in proximity to drugs and affirming jury conviction for constructive possession of cocaine with intent to distribute based on "extensive evidence" of the defendant's involvement in a cocaine distribution conspiracy coupled with additional evidence of constructive possession). Defendant's "mere presence" defense, claiming that he had no knowledge of the four kilograms of cocaine found inside the Nissan parked 10-20 feet away from the hotel room he occupied with his fellow co-conspirators, permitted evidence of defendant's involvement in four prior drug sales to Everson to be admitted under Rule 404(b) and considered by the jury in determining whether defendant constructively possessed the cocaine on June 4, 2002. *See United States v. Tomberlin*, 130 F.3d 1318, 1320-21 (8th Cir. 1997). *See also United States v. Bilderbeck*, 163 F.3d 971, 977 (6th Cir. 1999) (recognizing that "where the crime charged is one requiring specific intent, the prosecutor may use 404(b) evidence to prove that the defendant acted with the specific intent notwithstanding that the defense was lack of possession, not lack of intent to distribute"). Evidence of defendant's prior involvement in the ongoing New York/Youngstown cocaine conspiracy, coupled with additional evidence that defendant drove his co-conspirators 400 miles from New York to Youngstown on June 4, 2002 and watched from a hotel

19

room paid for by Almonte as Almonte took actual possession of the drug-filled Nissan immediately following a cell phone call placed by Everson, would permit any rational jury to conclude consistent with the district court's jury instructions that defendant jointly and constructively possessed the Nissan and its illicit contents either directly or through Almonte, Luis, and/or Medina. *Welch*, 97 F.3d at 150-51.

Because there was sufficient evidence presented to the jury to convict defendant of constructive possession of the four kilograms of cocaine, defendant's argument that the district court committed plain error when it failed to give an aiding and abetting instruction to the jury is not well taken. We fail to see how defendant's substantial rights were prejudiced by an instruction requiring the government to prove as it did defendant's constructive possession of the cocaine, as opposed to aiding and abetting the possession of cocaine. Aiding and betting simply requires proof that the defendant *participated in* the venture, as something he wished to bring about and sought to make succeed. *United States v. Ward*, 190 F.3d 483, 487 (6th Cir. 1999); *Phibbs*, 999 F.2d at 1062. Defendant was not prejudiced by the government's choice to proceed under the more difficult theory of constructive possession. Further, and unlike the situation in *Bryant* where the district court's failure to give an aiding and abetting intent instruction addressing specific criminal intent raised a possibility that the defendant's conviction was based solely on his act of driving a contraband seller to the scene of the sale, *Bryant*, 461 F.2d at 915, 921, the district court here instructed the jury under a constructive possession theory that the government was required to prove defendant "had in his possession what he knew was a controlled substance and that he intended to deliver it to someone else," that defendant "intended to exercise physical control over the item at some time, either directly or through other persons," and that "just being present with others who had possession isn't enough

20

to convict." These jury instructions eliminated any risk that defendant was convicted of possession of cocaine with intent to distribute based only on his driving Luis and Medina to the Hotel, and being in close proximity to the vehicle containing the drugs. The district court's failure to give an aiding and abetting instruction was harmless error. Fed. R. Crim. P. 52(a).

There was sufficient evidence in the record to convict defendant of possession with intent to distribute over five-hundred grams of powder cocaine and possession with intent to distribute over fifty grams of cocaine base.

### III.
### CONCLUSION

We AFFIRM defendant's convictions.

**CLAY, Circuit Judge, concurring in part and dissenting in part.**

The government was unable to find any drugs on Defendant's person, in Defendant's car or in Defendant's motel room. Thus, the government charged Defendant with constructive possession of the drugs the government found in Almonte's car, despite the fact that Defendant was never seen in or near Almonte's car and Defendant remained at the motel while Almonte left to deliver the drugs in his car. Consequently, I believe that the government failed to present sufficient evidence that Defendant possessed the drugs in question, and I respectfully dissent from Part B.ii. of the majority's opinion.

As the majority correctly notes, to prove that Defendant possessed the drugs in Almonte's car, the government must establish that Defendant constructively possessed the drugs in Almonte's car, in as much as the government failed to seek a jury instruction on aiding and abetting; nor did the government pursue a theory of possession under *Pinkerton v. United States,* 328 U.S. 640, 646 (1946). "Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), *overruled on other grounds*, *United States v. Singleton*, 902 F.2d 471 (6th Cir. 1990) (citation omitted). Constructive possession may be proved by circumstantial evidence; however, "[this Court has] long maintained that 'mere presence on the scene plus association with illegal possessors is not enough' to establish constructive possession." *United States v. Cochran*, 14 F.3d 1128, 1133 (6th Cir. 1994) (quoting *United States v. Birmely,* 529 F.2d 103, 107 (6th Cir. 1976)). Additionally, physical proximity is only relevant to the extent that a defendant's proximity enables the defendant to access the contraband in question. *See United States v. Hardin*, 248 F.3d 489, 498 (6th Cir. 2001) (proximity relevant because

22

Defendant was able to reach the gun in question); *see also United States v. Arnold*, - - - F.3d - - - , 2005 WL3315297, at * 4-6 (6th Cir. 2005) (per curiam) (holding that proximity insufficient to establish possession where gun found under the passenger seat of car and the defendant was in the passenger seat).

There is no evidence in the instant case that Defendant had the "power . . . to exercise dominion or control" over the drugs in Almonte's car, and thus the evidence is not sufficient to uphold his conviction for possession. *See United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991); *Craven*, 478 F.2d at 1333. Defendant was never seen in or near Almonte's car. Additionally, Defendant remained at the motel when Almonte and the others left to deliver the drugs in Almonte's car. The only evidence linking Defendant to the drugs in Almonte's car is Defendant's proximity to the car – he was standing 10 to 20 feet away from the car in a doorway – and his relationship with Almonte , a co-conspirator. Defendant's proximity to the car is insufficient to enable him to access the drugs personally, and his relationship with Almonte does not establish *a fortiori* that Defendant has sufficient control over Almonte to access drugs in Almonte's car. For these reasons, the evidence is insufficient for any rational trier of fact to conclude that Defendant exercised sufficient dominion or control to constructively possess the cocaine seized from Almonte's car.

Similarly, Defendant's purported control over drug money, recounted at trial by a convicted dealer who received a significant sentence reduction for his testimony, and who originally stated that he did not know Defendant, despite being able to identify the other defendants involved in the conspiracy, fails to support the proposition that Defendant controlled the drugs in Almonte's car. The prosecution charged Defendant with possessing the drugs in Almonte's car, and thus the government was required to prove that Defendant had the ability to exercise dominion or control

23

over those particular drugs. Evidence that Defendant counted drug money no doubt evidences that Defendant has possessed or controlled some drugs at some point in the past, but does not prove that he had control over the particular drugs in Almonte's car.

The majority errs in assuming that because the evidence may support a conspiracy conviction that the evidence would also support a conviction for constructive possession. Maj. Op. Part B.ii. (focusing on evidence supporting Defendant's knowledge of conspiracy and distinguishing cases finding insufficient evidence because those cases did not contain evidence of conspiracy). Conspiracy and possession are separate crimes with different elements, *see Pinkerton*, 328 U.S. 640, 643 (1946), and unless the prosecution proceeds under a *Pinkerton* theory, the prosecution must produce evidence sufficient to establish each element of possession even where the prosecution proves conspiracy. *United States v. Polk,* 56 F.3d 613, 619 n.4 (5th Cir. 1995); *United States v. Corley*, 824 F.2d 931, 937 n. 10 (11th Cir. 1987). Conspiracy requires proof of: (1) an agreement to violate the law; (2) intent to join the conspiracy; and (3) an act in furtherance of the conspiracy. *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996). Possession, in contrast, requires proof of dominion or control over the contraband in question. *White,* 932 F.2d at 589; *Craven*, 478 F.2d at 1333. Here, there is absolutely no proof that Defendant had dominion or control over the drugs in question or the car in which they were found. Contrary to the majority's opinion, no rational juror would conclude that Defendant possessed the drugs, constructively or otherwise, simply because Defendant was seen standing in a doorway adjacent to the parking lot from which Almonte drove away with the drugs in question. Thus, despite proof that Defendant may have had knowledge of and participated in a conspiracy, there is no proof that Defendant possessed the drugs in Almonte's car.

The majority stretches the theory of constructive possession beyond reasonable limits to in an attempt to compensate for the prosecution's failure to request *Pinkerton* instructions.   In the absence of the trial court giving the jury *Pinkerton* instructions, this Court cannot assume that the jury found the facts necessary to sustain a conviction under *Pinkerton,* in particular that: (1) Almonte possessed the particular drugs in his car in furtherance of the conspiracy of which Defendant was convicted; and (2) that at the time of the raid, Defendant was still a member of the conspiracy.  *See Pinkerton*, 328 U.S. at 645; *see also United States v. Martin*, 920 F.2d 345, 348-49 (6th Cir. 1990).  Regardless of whether the record on a appeal would support such findings if the jury had made them, it is wholly improper for this Court on appeal to make findings of fact for the jury.  *See* U.S. Const. amend. VI.

For the foregoing reasons, I would **REVERSE** the district court's denial of Defendant's motion to acquit on the possession convictions and **VACATE** Defendant's sentence for possession.